233 P.3d 554 (2010)
STATE of Washington, Respondent,
v.
James Frank JAIME, Appellant.
No. 82008-2.
Supreme Court of Washington, En Banc.
Argued May 14, 2009.
Decided May 27, 2010.
*555 Stephanie C. Cunningham, Attorney at Law, Seattle, WA, for Appellant.
Kevin Gregory Eilmes, Yakima County Prosecutor's Office, Yakima, WA, for Respondent.
STEPHENS, J.
¶ 1 This case comes before the court on direct review. James Frank Jaime was charged with one count of second degree murder. He was tried in front of a jury in a jailhouse courtroom and convicted. We are asked to consider whether holding Jaime's trial in a jailhouse courtroom violated his right to due process by eroding the presumption of innocence. We hold that it did and reverse Jaime's conviction and remand for a new trial.[1]

FACTS AND PROCEDURAL HISTORY
¶ 2 On the night of December 27, 2005, Ignacio Ornales was shot and killed in Yakima during an apparent drug deal. Jaime was arrested for the murder. During pretrial proceedings, the possibility was raised of holding Jaime's jury trial in a courtroom located in the county jail across the street from the county courthouse, rather than in the courthouse itself. Defense counsel strenuously objected on the basis that requiring Jaime to be tried in a jailhouse was akin to shackling him in front of the jury and would unfairly prejudice him. The prosecution argued that Jaime presented a serious security concern and should be tried in the jail. The prosecution also argued that this actually benefited Jaime because he would otherwise need to be handcuffed for transport between the jail and the courthouse and there was a risk the jury might see him during transport; a jailhouse trial eliminated that possibility. After hearing argument from counsel, the court decided to hold the trial in the jail. In rendering its oral decision, the court noted allegations concerning threats by Jaime or his friends against the witnesses and alluded to Jaime's history of violent behavior in jail and escape attempts, explaining that there was better security in the jail courtroom. The court also considered the convenience of holding the trial in the jail courtroom in that it was much easier to usher the jury in and *556 out of the jail courtroom in a timely fashion because the jury room was just across the hall from the courtroom. The court explained that it agreed with the State that there was less chance the jury would see Jaime in handcuffs if the trial took place in the jail. Finally, the court noted the jailhouse courtroom was designed to accommodate jury trials and was in design comparable to other courtrooms.
¶ 3 Jaime's trial commenced with voir dire on October 3, 2006. The trial court told the jurors, falsely, that the trial's location was simply the result of scheduling and administrative needs. The jury convicted Jaime of second degree murder. He appealed his conviction to Division Three of the Court of Appeals, arguing that holding his jury trial in the jailhouse compromised his constitutional right to due process and the presumption of innocence. Because the question concerning the location of trial presents a fundamental and urgent issue of broad public import, the Court of Appeals certified the case for direct review.[2] Jaime asks this court to reverse his conviction and remand for a new trial.

ANALYSIS
¶ 4 Jaime argues that a trial held in a jailhouse setting is the type of inherently prejudicial practice that erodes the presumption of innocence afforded to a criminal defendant and thereby violates his due process right to a fair trial. "The presumption of innocence, although not articulated in the Constitution, `is a basic component of a fair trial under our system of criminal justice.'" State v. Finch, 137 Wash.2d 792, 844, 975 P.2d 967 (1999) (quoting Estelle v. Williams, 425 U.S. 501, 503, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976)). In order to preserve a defendant's presumption of innocence before a jury, the defendant is "entitled to the physical indicia of innocence which includes the right of the defendant to be brought before the court with the appearance, dignity, and self-respect of a free and innocent man." Id. "Measures which single out a defendant as a particularly dangerous or guilty person threaten his or her constitutional right to a fair trial." Id. at 845, 975 P.2d 967. Such measures threaten a defendant's right to a fair trial because they erode his presumption of innocence; these types of courtroom practices are inherently prejudicial. See, e.g., id. at 844-45, 975 P.2d 967.[3]
¶ 5 Thus, the first question we must answer is whether a jailhouse setting is inherently prejudicial and thereby offends due process. We begin with the recognition that "the courtroom in Anglo-American jurisprudence is more than a location with seats for a judge, jury, witnesses, defendant, prosecutor, defense counsel and public observers; the setting that the courtroom provides is itself an important element in the constitutional conception of trial, contributing a dignity essential to `the integrity of the trial' process." Estes v. Texas, 381 U.S. 532, 561, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) (Warren, C.J., concurring) (quoting Craig v. Harney, 331 U.S. 367, 377, 67 S.Ct. 1249, 91 L.Ed. 1546 (1947)). Because the courtroom setting itself is essential to a trial's integrity, we should be wary of a setting that impermissibly influences a jury's decision-making process and jeopardizes the presumption of innocence.
¶ 6 "When a courtroom arrangement is challenged as inherently prejudicial, the question to be answered is whether an unacceptable risk is presented of impermissible factors coming into play." In re Pers. Restraint of Woods, 154 Wash.2d 400, 417, 114 P.3d 607 (2005) (citing Holbrook v. Flynn, 475 U.S. 560, 570, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986)). A courtroom practice might present an unacceptable risk of impermissible factors coming into play because of "the wider range of inferences that a juror might reasonably draw" from the practice. Holbrook, 475 U.S. at 569, 106 S.Ct. 1340.
*557 ¶ 7 In Holbrook, the Court considered whether the presence of security guards in the courtroom was inherently prejudicial. Id. at 568-69, 106 S.Ct. 1340. Preliminarily, the Court did not focus its inquiry on the particular arrangement of the guards at Holbrook's trial. Id. Instead, it considered whether the presence of security guards in general was inherently prejudicial. Id. In concluding it was not, the Court found it significant that "[o]ur society has become inured to the presence of armed guards in most public places; they are doubtless taken for granted so long as their numbers or weaponry do not suggest particular official concern or alarm." Id. at 569, 106 S.Ct. 1340.
¶ 8 Consistent with this analysis, the question here is whether the average juror would take for granted his or her presence in a jail, i.e., whether jurors are so inured to the experience of being in a jail building that it would have no effect on their perspective as jurors. The answer is self-evident. "`[R]eason, principle, and common human experience'" tell us that the average juror does not take for granted a visit to a jail. Id. at 569, 106 S.Ct. 1340 (quoting Estelle, 425 U.S. at 504, 96 S.Ct. 1691). The average juror does not frequent the jailhouse for the very reason that a jailhouse is not meant to be a public space. Unlike a courthouse, in which the public is welcome toand in some instances required toconduct all manner of business, a jail serves a specific purpose not generally applicable to the public at large.
¶ 9 The difference between jailhouses and courthouses is evident even in their architectural contrast. Courthouses are often monuments of public life, adorned with architectural flourishes and historical exhibits that make them inviting to members of the public. Many of our county courthouses are on historical registries and are visited each year by school children, civic groups, and tourists. A jail, on the other hand, is singularly utilitarian. Its purpose is to isolate from the public a segment of the population whose actions have been judged grievous enough to warrant confinement. Jail buildings are typically austere in character, and entrance is subject to heightened security. Indeed, the Yakima County jail in which Jaime's trial was held was described by the judge in an unrelated trial as "a monolithic concrete building." Br. of Appellant at 111, State v. Sanchez, No. 26816-1-III (Wash.Ct.App. Jan. 23, 2009) (oral argument stayed pending decision in this case).
¶ 10 Given the character of a jail, a juror would not take a visit to a jailhouse for granted, nor would he or she be inured to the experience. See Holbrook, 475 U.S. at 569, 106 S.Ct. 1340. A juror's experience with jail is very likely limited to what our societal discourse tells us of jails: they are high-security places that house individuals who need to be in custody. That the average juror would draw a corresponding inference from that experience is reasonable to surmise.[4]
¶ 11 Of course, some jurors' experience with a jail may be more personal but no less negative. What if, for example, one of Jaime's jurors was the victim of domestic violence whose abuser was housed in the jail? Her visit to the jail would not strike her as unremarkable or routine. It takes no great logical leap to conclude that such a juror's heightened awareness of her surroundings could contribute negatively to her view of the defendant.
¶ 12 In short, under the analysis of Holbrook, holding a trial in a jail courtroom is inherently prejudicial for two reasons. First, the setting is not in a courthouse, a public building whose purpose is to provide a neutral place to conduct the business of the law. Second, the setting that replaces the courthouse has a purpose and function that is decidedly not neutral, routine, or commonplace. Holding a criminal trial in a jailhouse building involves such a probability of prejudice that we must conclude it is "`inherently lacking in due process.'" Holbrook, 475 U.S. at 570, 106 S.Ct. 1340 (quoting Estes, 381 U.S. at 542-43, 85 S.Ct. 1628).
*558 ¶ 13 Our decision accords with that of a neighboring jurisdiction that has considered the propriety of a trial held outside a courthouse. In State v. Cavan, 337 Or. 433, 98 P.3d 381 (2004), the Oregon Supreme Court considered a defendant's trial that was held in a state correctional facility. Cavan is not directly analogous to this case because it involved a trial held in a prison rather than a county jail, but we find that much of the court's description of the prejudice inherent in holding a trial in a prison applies to a jail. Both settings are places "that the public, as a general matter, is unlikely to visit," where the jury's safety and "to a large extent, the trial itself, are in the control of the [facility's] administrators and corrections personnel." Id. at 448, 98 P.3d 381. Most importantly, a jail, like a prison, "forcefully conveys to a jury the overriding impression of a defendant's dangerousness and ... by extension, his or her guilt." Id.
¶ 14 Our decision should not be misunderstood to suggest that a jailhouse courtroom may never be used for a jury trial. As with other inherently prejudicial practices such as shackling, a jailhouse setting may be the "fairest and most reasonable way to handle" defendants who are found to present a serious safety risk. Illinois v. Allen, 397 U.S. 337, 344, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970) (acknowledging that shackles or other restraints, while inherently prejudicial, may in some cases be necessary). But as with shackling, trial courts are obligated to undertake a careful analysis of the facts of the situation to determine whether the extraordinary measure is warranted.
¶ 15 We review trial management decisions for abuse of discretion. "A trial judge must exercise discretion in determining the extent to which courtroom security measures are necessary to maintain order and prevent injury." State v. Hartzog, 96 Wash.2d 383, 400, 635 P.2d 694 (1981). But "`[c]lose judicial scrutiny' is required to ensure that inherently prejudicial measures are necessary to further an essential state interest." Finch, 137 Wash.2d at 846, 975 P.2d 967 (quoting Estelle, 425 U.S. at 504, 96 S.Ct. 1691). In particular, a trial court may impose restraints upon a defendant "`only when necessary to prevent injury to those in the courtroom, to prevent disorderly conduct at trial, or to prevent an escape.'" Id. (quoting Hartzog, 96 Wash.2d at 398, 635 P.2d 694). The judge's decision must take into account "specific facts relating to the individual" and be "founded upon a factual basis set forth in the record." Hartzog, 96 Wash.2d at 399-400, 635 P.2d 694 (emphasis added).
¶ 16 It is within this context that we review the trial court's decision to utilize a jailhouse courtroom for Jaime's jury trial. We conclude that the record does not support the trial court's decision. While there was some discussion indicating that Jaime presented a security concern and an escape risk, Verbatim Report of Proceedings (Oct. 2, 2006) at 40, this was based upon unverified representations made by the prosecutor, with no fact-finding conducted by the trial court.
¶ 17 Moreover, the trial court considered impermissible factors involving convenience in making its decision, as well as general concerns that would be applicable to any defendant who is in custody during trial, namely the risk that jurors might see Jaime being transported in handcuffs from the jail to the courthouse. Id.; see State v. Gonzalez, 129 Wash.App. 895, 905, 120 P.3d 645 (2005) (stating that where "juror views of restrained defendants are inevitable in this county ... then it is the transport procedures which must change, not the constitutional presumption of innocence"). Without a factual record that Jaime's trial presented particular security concerns, it cannot be said that the prejudicial measure of holding the trial in the jail was "necessary to further an essential state interest." Finch, 137 Wash.2d at 846, 975 P.2d 967. Where the risk of eroding the presumption of innocence is presented, the trial court may not rely on mere assertions but must develop a factual record to support the extraordinary measure of holding a trial in a jail building.[5]

*559 CONCLUSION
¶ 18 We erect courthouses for a reason. They are a stage for public discourse, a neutral forum for the resolution of civil and criminal matters. The unique setting that the courtroom provides "is itself an important element in the constitutional conception of trial, contributing a dignity essential to `the integrity of the trial' process." Estes, 381 U.S. at 561, 85 S.Ct. 1628 (Warren, C.J., concurring) (quoting Craig, 331 U.S. at 377, 67 S.Ct. 1249). The use of a space other than a courthouse for a criminal trial, particularly when that space is a jailhouse, takes a step away from those dignities. We hold that the setting of Jaime's trial infringed upon his right to a fair and impartial trial, and we remand for proceedings consistent with this opinion.
WE CONCUR: CHARLES W. JOHNSON, GERRY L. ALEXANDER, RICHARD B. SANDERS, TOM CHAMBERS and SUSAN OWENS, Justices.
ALEXANDER, J. (concurring).
¶ 19 I agree in every respect with the majority opinion written by Justice Stephens. I write separately for the sole purpose of responding to Justice J.M. Johnson's remarks on the fact that in the past and present some of our counties have located their jail within the county courthouse. While he is correct in that assertion, it should be noted that in those counties where this is or has been the practice, the county jail has generally been located on the top floor of the courthouse. In other counties, the jail has been situated in a separate building adjacent to but connected to the courthouse. In either case, the jail has been kept completely separate from the portion of the courthouse that contained courtrooms and other county offices. Thus, one entering such a county courthouse to conduct business or attend a court session would have no sense that they were in a building that housed the jail. That is entirely different from the situation we are presented with here, the record making it clear that Yakima County's jail building was designed and built for the purpose of serving as a house of detention. That is its entire purpose and the addition of a courtroom within the walls of that building was entirely an afterthought. Thus, persons entering the Yakima County jail building intending to attend a jury trial, unlike persons entering a courthouse of the sort described above, will be aware that they are entering a jail facility.
¶ 20 In the final analysis, there is a significant difference between a jail in a courthouse and a courtroom in a jailhouse. For the reasons stated by Justice Stephens, we can reasonably conclude that a jailhouse courtroom is not a neutral site and conducting a criminal case jury trial in such a setting erodes the presumption of innocence to a degree that denial of due process of law is the inescapable result.
SANDERS, J. (concurring).
¶ 21 I concur in the majority's decision to reverse the conviction and remand this case for a new trial based upon the use of the jailhouse courtroom. However, I would also reverse and remand because the trial court erred when it excluded relevant expert testimony on eyewitness identification.
¶ 22 This court in State v. Cheatam, 150 Wash.2d 626, 649, 81 P.3d 830 (2003), set forth the standard by which a trial court must determine whether expert testimony concerning witness reliability should be admitted:
[W]here eyewitness identification of the defendant is a key element of the State's case, the trial court must carefully consider whether expert testimony on the reliability of eyewitness identification would assist the jury in assessing the reliability of eyewitness testimony. In making this determination the court should consider the *560 proposed testimony and the specific subjects involved in the identification to which the testimony relates, such as whether the victim and the defendant are of the same race, whether the defendant displayed a weapon, the effect of stress, etc.
¶ 23 Here, eyewitness identification was a key element of the State's case. The defense expert witness would have testified on the effects of lighting, weapon focus, stress, and cross-racial identification on the accuracy of a witness' identification. Those effects were more than "marginal[ly] relevan[t]" here and would have assisted a jury to assess the accuracy of three of the four witnesses' identificationsthat of Linda Gange, Deanne Moore, and Rachel McClaskey. Cheatam, 150 Wash.2d at 650, 81 P.3d 830.
¶ 24 First, lighting was at issue because it was "`pretty dim'" in the house and dark outside. Trial Tr. vol. IV, 141, Oct. 5, 2006. In contrast, this court in Cheatam determined lighting was not materially relevant in the rape because the assailant was extremely close to the victim and the victim, working with a sketch artist, was able to produce a "nearly photo perfect" sketch of the assailant. 150 Wash.2d at 649, 81 P.3d 830. But here descriptions of the shooter were vague. Gange's testimony was limited to his clothing and that he was of Hispanic descent; she was unable to recall his hair color, how his hair was trimmed, or whether he was wearing a hat or that he had a tattoo on his face. Trial Tr. vol. IV, 128-29, Oct. 5, 2006; Trial Tr. vol. V, 230-31, Oct. 6, 2006. Moore could only testify Jaime had the same "shape of [the shooter's] face," and she felt she was only about 50 percent sure the shooter was Jaime. Trial Tr. vol. VI, 441-42, Oct. 9, 2006. McClaskey only specifically remembered the shooter was "about [her] height and stocky build, squinty eyes," id. at 484, and did not identify Jaime until two to three days after the incident in a photographic lineup, id. at 471. The eyewitness accounts here lacked any indicators of objective reliability like those present in Cheatam, 150 Wash.2d at 649-50, 81 P.3d 830.
¶ 25 Second, weapon focus was apparent from the testimony. Gange extensively detailed the appearance of the gun. Trial Tr. vol. IV, 146-48, Oct. 5, 2005. Moore observed something fall from the gun to the floor when the shooter drew the gun. Trial Tr. vol. VI, 436, 438, Oct. 9, 2006. McClaskey observed the shooter loading a clip. Id. at 459-60.[1] In contrast, the victim in Cheatam saw the knife for only a very brief instant, after which the weapon was hidden from her sight. 150 Wash.2d at 650, 81 P.3d 830.
¶ 26 Third, stress was a factor for the witnesses. The shooter threatened to kill everyone in the room and was waiving his gun around when he did so. Trial Tr. vol. IV, 138-39, Oct. 5, 2006. As discussed above, the resulting eyewitnesses' descriptions were vague. In contrast, the victim in Cheatam testified that she realized at the time of the attack the importance of later recognizing the attacker, carefully examined his face, and memorized his features. 150 Wash.2d at 649, 81 P.3d 830. The resulting sketch of her assailant was "nearly photo perfect." Id.
¶ 27 Fourth, cross-racial identification is relevant here. The record indicates Gange, Moore, and McClaskey were not Hispanic and thus did not share the same race as the shooter and Jaime. See Trial Tr. vol. IV, 128, Oct. 5, 2006; Trial Tr. vol. VI, 443, Oct. 9, 2006. In Cheatam, the "nearly photo perfect" sketch demonstrated that cross-racial identification did not hinder the victim in identifying the assailant. 150 Wash.2d at *561 650, 81 P.3d 830. Here, again, descriptions of the shooter were vague. Gange did identify Jaime once as the shooter out of a lineup of other Hispanic men, but later in the same day was unable to do so again. Trial Tr. vol. IV, 245, Oct. 5, 2006. Cross-racial identification issues may account for such difficulty and would have been helpful to the jury in its deliberations.
¶ 28 The expert testimony would not have been relevant to the identification by the fourth witness, Shawn Stahlman. He had known Jaime for 10 years prior to the incident. Trial Tr. vol. V, 325, Oct. 6, 2006. However, his testimony does not provide an objective confirmation of the identifications of the other witnesses. Cf. Cheatam, 150 Wash.2d at 649-50, 81 P.3d 830 (where the "nearly photo perfect" sketch the victim was able to produce with a sketch artist was an objective confirmation that lighting, weapon focus, stress, and cross-racial issues did not render her identification less reliable). There are numerous reasons why a jury would doubt the veracity of Stahlman's testimony. Stahlman admitted he agreed to testify only because, in exchange, the State dismissed the charges against him arising from this incident. Trial Tr. vol. V, 309-10, 340, Oct. 6, 2006. Stahlman had originally blamed a "Javier" for the shooting and then later Stahlman himself confessed to the shooting. Id. at 335-37, 358-60. Stahlman also testified he was regularly using methamphetamine throughout the month of the shooting and had used cocaine and drank beer the day of the shooting. Id. at 343-46. Stahlman ultimately testified he did not actually see the shooting. Id. at 337, 358. Stahlman's testimony did not provide an objective confirmation of the reliability of the identifications by the other witnesses in any way similar to how the "nearly photo perfect" sketch objectively confirmed the witness identification in Cheatam, 150 Wash.2d at 649-50, 81 P.3d 830.
¶ 29 The trial court abused its discretion by not permitting Jaime to present expert testimony concerning the effects of lighting, weapon focus, stress, and cross-racial issues on the accuracy of the witnesses' identifications. See Cheatam, 150 Wash.2d at 645, 81 P.3d 830 ("Admissibility of expert testimony under ER 702 is within the trial court's discretion."). The appropriate standard is whether the testimony "would assist the jury in assessing the reliability of eyewitness testimony." Id. at 649, 81 P.3d 830. The standard is not whether the trial court believes that the jury will ultimately find the identifications unreliable as a result. The expert testimony would have been helpful to a jury to consider the reliability of, and vagueness and inaccuracies in, the eyewitness accounts of Gange, Moore, and McClaskey. That should have been the end of the trial court's inquiry, and the testimony should have been admitted.
¶ 30 Weighing the evidence is squarely within the province of the jury. Convictions and acquittals are still determined by a jury of peers, and the power to find a defendant guilty still rests in their hands.
¶ 31 I concur.
I CONCUR: TOM CHAMBERS, Justice.
FAIRHURST, J. (dissenting).
¶ 32 According to the majority, James Frank Jaime's due process right to the presumption of innocence was violated when his trial was held in a permanent courtroom in the county jail building (jail building courtroom). I cannot agree. I would hold that the practice of conducting trials in a jail building courtroom is not inherently prejudicial, and I would uphold Jaime's conviction for second degree murder.
¶ 33 To reach today's holding, the majority first relies on cases involving shackles and prison garb. While there is no doubt that it is inherently prejudicial to shackle a defendant during trial, State v. Finch, 137 Wash.2d 792, 844, 846, 975 P.2d 967 (1999), or force a defendant to wear prison garb during trial, Estelle v. Williams, 425 U.S. 501, 502, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976), conducting a trial in a permanent courtroom in the jail building does not raise the same constitutional concerns. Shackling can be of such a physical restraint as to deprive a defendant of the right to appear and defend himself or herself. State v. Williams, 18 Wash. 47, 51, 50 P. 580 (1897); WASH. CONST. *562 art. I, § 22. Shackling is also a very visible restraint[1] that indicates to the jury the defendant is so dangerous as to not be trusted even by the judge. Finch, 137 Wash.2d at 845, 975 P.2d 967. Similarly, a defendant who is forced to wear prison garb is distinctly marked as a dangerous or guilty person. See Estelle, 425 U.S. at 504-05, 96 S.Ct. 1691.
¶ 34 But Jaime's entitlement "to the physical indicia of innocence" is limited; it confers the "right of the defendant to be brought before the court with the appearance, dignity, and self-respect of a free and innocent man," not to choose a particular courtroom. Finch, 137 Wash.2d at 844, 975 P.2d 967. A courtroom is a location, not an accoutrement.[2] Because a courtroom does not serve as an identifier, it does not possess the inherently prejudicial power of a shackle or a prison uniform. While some aspects of a court setting may cause prejudice in certain cases, there simply is no basis to conclude that the practice of conducting trials in a jail building courtroom is always and inherently prejudicial.
¶ 35 To bolster its notion of inherent prejudice, the majority, at page 4, cites language depicting the courtroom as "an important element in the constitutional conception of trial, contributing a dignity essential to `the integrity of the trial process.'" Estes v. Texas, 381 U.S. 532, 561, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) (Warren, C.J., concurring) (quoting Craig v. Harney, 331 U.S. 367, 377, 67 S.Ct. 1249, 91 L.Ed. 1546 (1947)). While this proposition is true, Estes is inapposite. The defendant in Estes was a "notorious character" whose courtroom proceedings were broadcast live on television and radio. Id. at 536, 85 S.Ct. 1628. Describing the scene, the Court noted that "at least 12 cameramen were engaged in the courtroom throughout the hearing taking motion and still pictures and televising the proceedings. Cables and wires were snaked across the courtroom floor, three microphones were on the judge's bench and others were beamed at the jury box and the counsel table." Id. Because the media caused "considerable disruption" of the defendant's courtroom proceedings, the Court concluded that the defendant had been robbed of the "judicial serenity and calm to which [he] was entitled." Id.
¶ 36 No such concerns were implicated here. According to the record, the jail building courtroom was a permanent courtroom used to conduct court business, and the room itself appeared like any other courtroom. Like the courtrooms in the courthouse, it was specifically designed for jury trials and was windowless. There were no disruptions during trial. In short, there was no interference with Jaime's right to the "solemn decorum" of an orderly trial procedure and no violation of his due process rights. Id. at 548, 85 S.Ct. 1628.
¶ 37 Finally, the majority contends that there was a "`wider range of inferences that a juror might reasonably draw'" from the courtroom's location in the jail building. Majority at 556 (quoting Holbrook v. Flynn, 475 U.S. 560, 569, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986)). The majority argues this presented an "`unacceptable risk'" that "`impermissible factors'" would come into play. Id. (quoting In re Pers. Restraint of Woods, 154 Wash.2d 400, 417, 114 P.3d 607 (2005) (citing Holbrook, 475 U.S. at 570, 106 S.Ct. 1340)). While the majority uses Holbrook to support its contention, a closer analysis of the case *563 compels the opposite conclusion. In Holbrook, the United States Supreme Court determined that the defendant received a fair trial, even though the Court's usual security force was bolstered by four uniformed state troopers sitting in the front row of the spectator section. Holbrook, 475 U.S. at 562, 106 S.Ct. 1340. The Court focused its analysis on the wider inferences that could be drawn from the troopers' presence, but it specifically highlights permissible inferences. According to the Court:
While shackling and prison clothes are unmistakable indications of the need to separate a defendant from the community at large, the presence of guards at a defendant's trial need not be interpreted as a sign that he is particularly dangerous or culpable. Jurors may just as easily believe that the officers are there to guard against disruptions emanating from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into violence. Indeed, it is entirely possible that jurors will not infer anything at all from the presence of the guards. If they are placed at some distance from the accused, security officers may well be perceived more as elements of an impressive drama than as reminders of the defendant's special status.
Id. at 569, 106 S.Ct. 1340. Holbrook actually undermines the majority's contentionit stands for the proposition that if jurors could reasonably infer explanations for additional security measures other than the defendant's dangerousness or guilt, the security measures do not prejudice the defendant, as long as there is not "`an unacceptable risk'" that "`impermissible factors com[e] into play.'" Id. at 570, 106 S.Ct. 1340 (quoting Estelle, 425 U.S. at 505, 96 S.Ct. 1691).
¶ 38 Here, the trial court specifically instructed the jury that the trial was being held in the jail building courtroom for administrative reasons.[3] Like the jurors in the Holbrook trial, it is "entirely possible" (and even likely) that the jurors in Jaime's trial "[did] not infer anything at all from" their particular courtroom location. Id. at 569, 96 S.Ct. 1691.
¶ 39 There is also nothing to indicate that the jurors in Jaime's trial were subjected to any "`impermissible factors.'" Id. at 570, 96 S.Ct. 1691 (quoting Estelle, 425 U.S. at 505, 96 S.Ct. 1691). Jurors were required to submit to security screenings, and women were required to leave their purses outside the courtroom, but these requirements do not differ substantially from those that occur in many courtrooms.[4] There is simply no evidence to suggest that the trial venue, by itself, was inherently prejudicial.
¶ 40 The inherent prejudice caused by compelling a defendant to wear shackles or prison garb during trial comes from the fact that the defendant is forced to bear "`unmistakable indications' of dangerousness or guilt." Finch, 137 Wash.2d at 845, 975 P.2d 967 (quoting Holbrook, 475 U.S. at 568-69, 106 S.Ct. 1340). This is not true of a permanent courtroom inside the jail building. The courtroom where Jaime's trial was held was, in all relevant aspects, comparable or identical to a courtroom in the courthouse. The jury was provided with a reasonable explanation for the venue that did not prejudice the defendant, and the trial proceeded without disruption. On the record before us, there is simply no indication that Jaime was denied the presumption of innocence. I respectfully dissent.
*564 WE CONCUR: BARBARA A. MADSEN, Chief Justice, and JAMES M. JOHNSON, Justice.
J.M. JOHNSON, J. (concurring in dissent).
¶ 41 I concur in the dissent written by Justice Fairhurst. I write separately, however, to emphasize two points that the majority fails to consider and that are determinative of the resolution of this case. The first is the fundamental constitutional presumption underlying our jury system that jurors are intelligent and follow the instructions they are givennot inherently susceptible to bias as the majority believes. The second is the historic practice in Washington of situating county courthouses and jails in the same building, especially in rural locales. This practice has never before been held to contaminate jurors. I discuss each of these points in turn.
¶ 42 An abiding faith in the intelligence of juries and their commitment to follow the law has long been a fixture of our jurisprudence. We assume "that jurors are intelligent and responsible individuals." State v. Lord, 161 Wash.2d 276, 278-79, 165 P.3d 1251 (2007). This assumption is fundamental to our democratic system of governance, given that "[a] similar assumption about voters," the pool from which we draw jurors, "underlies our democracy." Id. at 279, 165 P.3d 1251. As another court put it:
[O]ur system of laws depends upon the assumption that jurors are intelligent. "A juror is not some kind of dithering nincompoop, brought in from never-never land and exposed to the harsh realities of life for the first time in the jury box."
People v. Barnum, 104 Cal.Rptr.2d 19, 24 (Cal.Ct.App.2001) (citation omitted) (quoting People v. Long, 38 Cal.App.3d 680, 689, 113 Cal.Rptr. 530 (Cal.Ct.App.1974)), superseded on other grounds, 29 Cal.4th 1210, 131 Cal. Rptr.2d 499, 64 P.3d 788 (2003). The majority contradicts the presumption of juror responsibility, intelligence, and honesty when it summarily concludes that "the average juror would draw a[n] [improper] inference" about a defendant's guilt from the fact that trial was held in a jail courtroom. Majority at 557.
¶ 43 Even if the majority were correct to disregard the assumption of jury intelligence in a particular case, "[a]s further protection, jury panels are instructed and solemnly charged by the court with the duty to avoid bias or prejudice." Lord, 161 Wash.2d at 279, 165 P.3d 1251. "It is to be presumed that the jurors, as sensible and intelligent men, obey[] the instruction of the court...." State v. Smails, 63 Wash. 172, 183, 115 P. 82 (1911); see also Coy v. Iowa, 487 U.S. 1012, 1035, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988) (Blackmun, J., dissenting) ("[W]e must assume [the jury] to have been intelligent and capable of following [court] instructions...."); State v. Montgomery, 163 Wash.2d 577, 605, 183 P.3d 267 (2008) (J.M. Johnson, J., concurring) ("`"Jurors are presumed to be ... intelligent [and] capable of understanding instructions ...."'" (quoting People v. Carey, 41 Cal.4th 109, 130, 158 P.3d 743, 59 Cal.Rptr.3d 172 (2007) (quoting People v. Lewis, 26 Cal.4th 334, 390, 28 P.3d 34, 110 Cal.Rptr.2d 272 (2001)))).
¶ 44 In this case, the trial court gave just such an express instruction to the jury, explaining that administrative convenience and scheduling needsnot the dangerousness of the defendant or other impermissible factorscaused the trial to be held in the jail courtroom instead of the courthouse. Verbatim Report of Proceedings (Oct. 3, 2006) at 2. We must presume that the jury was intelligent and capable of understanding, and indeed did follow, this court instruction. See Smails, 63 Wash. at 183, 115 P. 82; Coy, 487 U.S. at 1035, 108 S.Ct. 2798 (Blackmun, J., dissenting); Montgomery, 163 Wash.2d at 605, 183 P.3d 267; see also Samuel v. United States, 169 F.2d 787, 796 (9th Cir.1948) ("[S]ince verdicts of juries must be viewed as the work of ordinary intelligent and reasoning beings, judges will not presume that a jury would find guilt upon an item not proved...."). Given this presumption, the majority is wrong to abruptly conclude that "[h]olding a criminal trial in a jailhouse building involves such a probability of prejudice that ... it is `inherently lacking in due process.'" Majority at 557 (quoting Holbrook v. Flynn, 475 U.S. 560, 570, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986)).
*565 ¶ 45 The opposite conclusion is required, as case law from several other jurisdictions shows. Virginia, for example, has held that holding a trial in a courtroom inside of the administrative building of a correctional center does not violate a defendant's fair trial right. Howard v. Commonwealth, 6 Va.App. 132, 139, 367 S.E.2d 527, 531 (1988). In Howard, the space "in all respects resemble[d] a courtroom," (alteration in original) there was "no indication that the jurors could see the prison from the courtroom itself," and "[t]he jury did not have to pass through gates or other security devices to reach the courtroom." Id. at 532. Moreover, since the defendant was being tried for the murder of another inmate, "the jury necessarily had to know that he was [also] an inmate" at the jail. Id. Considering these facts, the court found that "the jury could reasonably have concluded that [the] trial was being conducted in the administration building for reasons of efficiency and convenience" and that "the location ... did not impermissibly suggest that [the defendant] was guilty ... or otherwise operate to inherently prejudice him." Id. (citing Holbrook, 475 U.S. at 570-72, 106 S.Ct. 1340).
¶ 46 Courts from states as varied as Mississippi, Utah, California, and Alaska have reached similar conclusions with respect to trials held inside penal institutions. See Harper v. State, 887 So.2d 817, 826 (Miss.Ct. App.2004) ("[W]e hold that there are such limited circumstances where a trial may be held inside a prison."); State v. Daniels, 40 P.3d 611, 618 (Utah 2002) (trying defendant in prison courtroom for murder of fellow inmate was not inherently prejudicial and did not create an unacceptable risk of presenting impermissible factors to jury); Barnum, 104 Cal.Rptr.2d at 25 ("We decline to infer the jury would likely conclude defendant was guilty because the trial occurred inside a state prison, thereby disregarding their instructions and common sense."); id. at 26 ("[T]he selective use of in-prison trials is beneficial to the State, the taxpayer and, in some cases, the defendant. It is not an inherently prejudicial practice."); Bright v. State, 875 P.2d 100, 109 (Alaska App.1994) ("[W]e are unwilling to flatly declare that the Alaska Constitution prohibits holding a criminal trial in a prison under any and all circumstances."). But see State v. Lane, 60 Ohio St.2d 112, 397 N.E.2d 1338, 1340 (1979) ("By holding a trial within a prison for an offense committed within that same institution, the constitutional right to a fair trial is abridged [because] [t]he presumption of innocence... is eroded [and] there is a major interference with the jury's ability to remain impartial....").
¶ 47 The majority's error in assuming that prejudice results from holding criminal trials in jail courtrooms is even more evident when one reflects on the history of the practice in our state. Jails and courtrooms wereand, in approximately one-third of Washington counties, still arelocated in the same county courthouses for reasons of convenience and fiscal economy. This was and remains particularly true in sparsely populated rural counties where the tax base can support only the most basic government infrastructure. I remind the court that, for many years, the courthouse that sits just across the street from the Temple of Justice housed both a jail and a courtroom (and one member of this court in fact presided over trials in that courtroom, just a few floors below the jail). I am certain that the proximity of the jail to the courtroom in that courthouse did not infect trials held there with bias or inherent prejudice, yet the majority's resolution of this case points to the opposite conclusion. Majority at 557 ("holding a trial in a jail courtroom is inherently prejudicial").[1]
¶ 48 To conclude, I agree with Justice Fairhurst that the practice of holding trials in jailhouse courtrooms is not inherently prejudicial. I stress that this conclusion is required by our strong presumption that jurors, as intelligent and sensible individuals, understand and follow the court's instructions *566 to disregard any bias or prejudice. The strength of this conclusion becomes even more apparent when one considers the historic practice of combining jail and court facilities in the same building in many Washington counties. For these two compelling reasons, as well as those articulated by Justice Fairhurst, I join in her dissent. The defendant here received a fair and constitutional trial and was properly convicted of second degree murder by an unbiased jury. I, too, would affirm his conviction.
NOTES
[1] We also took direct review on the issue of whether the trial judge abused his discretion in excluding an expert witness proposed by Jaime who intended to testify regarding the unreliability of eyewitnesses. Given our resolution of the trial locale issue, however, we need not reach the expert witness issue and decline to do so.
[2] An appeal in an unrelated case was stayed pending this decision. State v. Sanchez, No. 26816-1-III (Wash.Ct.App. Jan. 23, 2009).
[3] Other courtroom practices that have been found to be inherently prejudicial include shackling and similar restraints, State v. Hartzog, 96 Wash.2d 383, 398-99, 635 P.2d 694 (1981), forcing a defendant to dress in prison garb, Estelle, 425 U.S. at 504, 96 S.Ct. 1691, and allowing television cameras during trial, Estes v. Texas, 381 U.S. 532, 534-35, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965).
[4] We note that the inherent prejudice standard does not require us to know how jurors reacted to a particular security measure. A defendant need not show that jurors "actually articulated a consciousness of some prejudicial effect." Holbrook, 475 U.S. at 570, 106 S.Ct. 1340.
[5] We would also be remiss if we failed to express our disapproval of the "curative instruction" that was given here with the goal of remedying any prejudice arising from the trial's location. The trial judge's statement was as follows: "[W]e only have three jury rooms for deliberations. And so with a longer trial like this, the court administrator will frequently assign that trial over here [to the jail] where we have a jury room." Suppl. Verbatim Excerpt of Proceedings (Oct. 3, 2006) at 2. We are troubled by the statement because it was not true. The relationship between a trial judge and a jury relies on mutual trust, and the making of false statements to a jury by a judge should never be countenanced. Furthermore, even if the statement had been true, it provided no basis for holding Jaime's trial in the jail.
[1] These eyewitnesses saw the shooter before the shooter drew a gun, but this fact does not render weapon focus irrelevant because those pregun observations themselves were of questionable reliability. Gange saw him when he entered the house where the shooting took place. Trial Tr. vol. IV, 127-28, Oct. 5, 2006. Moore saw him prior to driving over to that house. Trial Tr. vol. VI, 424-25, Oct. 9, 2006. McClaskey saw him outside the house, while talking to the person accompanying him. Id. at 455-56. Gange's and McClaskey's pregun observations were in the dimly lit house or outside after nightfall. Moore was ultimately only 50 percent sure the shooter was Jaime. Id. at 441-42. All three of their pregun observations were in casual settings where they would have had no reason to make a detailed memory of his appearance. Cf. Cheatam, 150 Wash.2d at 649, 81 P.3d 830 (where the victim knew she needed to memorize the assailant's features to identify him after the attack).
[1] There are some physical restraints that can be worn under the defendant's clothing without being visible to the jury. In cases where such restraints were used, Washington courts have found that there was no prejudice to the defendant because a jury must be aware of a restraint to be prejudiced by it. See, e.g., State v. Hutchinson, 135 Wash.2d 863, 869-70, 888, 959 P.2d 1061 (1998) (leg brace); State v. Monschke, 133 Wash.App. 313, 336-37, 135 P.3d 966 (2006) (stun belt).
[2] The Oregon Supreme Court found that holding a trial in a maximum security prison was inherently prejudicial because it would "`enfold[] the defendant in prison accouterments [sic].'" State v. Cavan, 337 Or. 433, 446, 98 P.3d 381 (2004). However, Cavan is easily distinguishableCavan deals with a maximum security prison rather than a jail, id. at 445, 98 P.3d 381, the jurors in Cavan had to undergo significant extra security precautions as compared to those at the courthouse, id. at 436-37, 98 P.3d 381, and the crime in question in Cavan allegedly took place in the same prison where the trial was held, id. at 448, 98 P.3d 381.
[3] The majority's disapproval of the trial court's instruction is somewhat unfair. The trial court did consider security concerns, but it also considered the convenience of holding the trial in the jail building courtroom. According to the trial court, it was much easier to usher the jury in and out of the jail building courtroom because the jury room was just across the hall from the courtroom. Because the trial court based its decision partly on administrative convenience, its statement to the jury was not "false." Majority at 558-59 n. 5.
[4] The courtroom at the Yakima County Courthouse is among those with such requirements. See Frequently Asked Questions About Jury DUTY YAKIMA COUNTY CLERK 2, http://www.yakimacounty. us/clerk/Web04/Jury/Frequently%20Asked% 20Questions%20con verted% 20pdf.pdf (last visited May 25, 2010) ("Everyone entering the Courthouse may be required to go through a metal detector. Purses, briefcases, bags and other items carried into the Courthouse may also be searched.").
[1] The jailhouse courtroom at issue in the present case has been in existence for over 20 years. The majority's reasoning suggests that all of the convictions obtained during that time should be overturned or at least questioned because of the inherent prejudice of the courtroomindeed, it leaves all convictions obtained in all of the jailhouse courtrooms in our state vulnerable to attack.