IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 85788-6-I |
| Respondent, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| JAXON ADAMS, | |
| Appellant. | |

CHUNG, J. — Jaxon Adams challenges his conviction for assault in the second degree based on strangulation, unlawful imprisonment, and assault in the fourth degree of his former girlfriend, K.B. On appeal, he claims the presence of a uniformed officer in the courtroom during only K.B.'s testimony denied his right to a fair trial. We disagree and affirm his convictions.

FACTS

Jaxon Adams and K.B. began dating in February 2021. Shortly thereafter, K.B. went to visit Adams at his home in Federal Way. Although not initially planning to stay for an extended period of time, K.B. remained at the apartment until the end of April. Over the few months that K.B. lived with Adams, the relationship grew strained. Adams expressed jealousy of other men and had K.B. delete male contacts from her phone and social media. He also insisted they remain near one another and that he and K.B. shower together. He often looked over K.B.'s shoulder as she texted and threatened to break K.B.'s phone on

multiple occasions. At one point, Adams disabled a program on K.B.'s phone that allowed her family to see her location.

On April 26, 2021, Adams and K.B. argued because K.B. wanted to return to her home in Lummi Nation. K.B. later testified that she attempted to leave in her car, but as she was sitting with the key in the ignition, Adams reached through the window and broke the key fob. He then came around to the passenger seat, put his forearm around K.B.'s neck, and choked her. K.B. testified that Adams then released her, took her phone and keys, and said she was not permitted to leave. According to K.B., Adams prevented her from leaving in the days that followed in a variety of ways, including physically blocking doorways, keeping her phone or keys away from her, and threatening to harm himself if K.B. left.

K.B. recounted how on April 30, 2021, during another argument, Adams grabbed both of her arms and threw her against a wall, causing her to hit her head. While Adams was showering, K.B. saw an opportunity to leave. She gathered her phone and some belongings, got into her car, and drove away. During this time, she also texted and called her stepmother and father, explaining to them what happened and seeking their help. The next day, K.B. provided statements to Aaron Hillaire, Patrol Sergeant of the Lummi Nation Police Department, and Federal Way police officer Jon Dietrich.

On May 5, 2021, Adams was charged with assault in the second degree based on strangulation, unlawful imprisonment, later amended to add a charge of assault in the fourth degree, each with a domestic violence aggravator. Trial took

place in July 2023. During the trial, shortly before K.B. was to testify, the State requested "additional security to be present in the courtroom" for K.B.'s safety. When the trial court asked if there was a record of prior incidents that would warrant this action, the State replied there were no prior incidents in court, but that there were "prior incidents of violations of the no-contact order . . . within the last couple of years since this incident."[1] The State stated that none of the interactions had been violent, "but some of them have been intimidating in nature." In addition to raising security concerns, the State noted that "it's already hard enough to testify in a courtroom" and see the person who you are "accusing of committing crimes against you."

In response, the court stated it would let K.B. "hold hands with who[m]ever she wants to coming in," but it was "not going to order additional security absent some record of issues in the courtroom. There's always a risk that that creates a specter of prejudice in front of the jury." The court further elaborated that it needed "to make some findings" on the issue, noting "there's security around" as well as other security measures, and it would not "post extra officers for that reason," i.e., "to assuage concerns of a witness," whereas it might do so had there been a history of outbursts in court or similar concerns. Adams opposed the request, emphasizing the prejudice that would result from suddenly having an officer present in the courtroom and allowing the jurors to see K.B. escorted by

---

[1] The State did not elaborate on these allegations until after the trial had concluded, when Adams requested, and the court granted, an order allowing him to remain out of custody pending sentencing. In giving details about the incidents, the State mentioned two encounters at powwows Adams and K.B. attended.

3

police, arguing that "the spectacle of a cop, police officer, sheriff's deputy to be walking around with someone" was "a direct interference of due process."

The trial court asked whether the officers would walk K.B. into the courtroom itself or just to the doors, and the State responded, "That will depend on the Court's ruling, obviously, on whether or not the Court's going to allow a Sheriff's Officer to—to sit in the back of the courtroom." The court then ruled it would "not limit one officer from sitting in the pews, nor do I think I can," and, further, it would not limit K.B. from walking in the courtroom doors with whomever she wanted. Adams made a note for the record that there had not been a uniformed police officer in the courtroom the entire time up until when K.B. would testify. Adams argued there was no reason "to believe that [Adams] means to cause any harm." The court stated it was not making "any . . . finding about that." The court further clarified it would not be unduly prejudicial to have one officer sitting in the back of the courtroom, as "it's common for trials when folks are in custody," which "[t]he jury doesn't know," and it was also "common to have an officer—maybe even three—sitting quietly and just securing the situation."

The court also declined to order the officer to be in plainclothes, reasoning that a uniform alone was not "akin to wearing a shirt with someone's name on it or photos that would elicit sympathy," to which Adams responded, "Except the officer's going to leave . . . as soon as [K.B.'s] done. . . . The jury's not stupid." The court suggested the jury might conclude K.B. was in custody instead or "could think all sorts of things," but that there was nothing unduly prejudicial about a single officer in the back of the courtroom. However, the court did agree

4

to hold jurors back when K.B. entered or left the courtroom, so as to limit the amount of time the jury saw her with support personnel.

After K.B. provided some preliminary testimony outside the jury's presence, Adams raised the issue again and noted the victim advocate escorted K.B. to and from the witness stand. Adams argued this group of people assisting K.B. contributed to the "othering" of Adams, impacting his trial. In response, the court indicated that whoever assisted K.B. should not go past the spectator benches. The State then formally called K.B. as its next witness.

At lunch recess, consistent with Adams's request, the jury exited before K.B. and her support personnel left—including the sheriff's deputy—and the jurors were instructed to remain in the jury room for a few minutes afterward to prevent them from seeing K.B. outside of the courtroom as well. Before going off the record, Adams noted that another uniformed officer entered the courtroom during the proceedings and reemphasized the alleged resulting prejudice.

The trial court then added to the record that initially, "[t]here was one uniformed officer sitting in the back row of the courtroom on the defense side," and while it observed the sitting officer, "it looked like he was playing on his phone." The court stated that overall, "[t]here wasn't any show of force." In describing the second officer who entered into the courtroom, the trial court mentioned he chatted briefly with the seated officer but left almost immediately: "[H]e was in the courtroom for a moment. The officer did not come forward through the well, did not stand next to the witness, did not stand next to the defendant, did not otherwise make any motions to indicate that there was a

danger or a risk." To limit concerns of prejudice from the presence of additional officers, the trial court requested the officers communicate via text instead of gathering in the courtroom. Upon returning from the lunch break, the court noted there was a single uniformed officer in the back of the courtroom who was different from the officer before but in the same seat.

When trial resumed the following week, Adams filed a motion to dismiss based on the presence of the officers. The court again recounted events for the record. It specified that since the beginning of K.B.'s testimony, one uniformed, presumed armed, officer sat in the back of the courtroom. The court noted that the officers primarily stayed in the back of the courtroom, except for when K.B. first came in, which happened in front of the jury.

Adams then reemphasized the officers were clearly associated with K.B., and they left once K.B.'s testimony concluded. The trial court acknowledged there was a cognizable connection between K.B. and the officers, but it again suggested a reasonable jury may instead assume K.B. was in custody, since they seemed physically oriented toward her. During this exchange, Adams highlighted that the State had not demonstrated that K.B. required security.

The court responded that it read through Adams's briefing and several out-of-state decisions, which were primarily concerned with the appearance that officers are guarding the accused. Although the court recognized the presence of the officers was not entirely neutral, it did not believe the possible resulting prejudice was severe enough to warrant dismissal. The court did, however, offer

to instruct the jury with a curative instruction or to keep an officer present for the remainder of the trial regardless of who was testifying.

When invited to contribute to the record, the prosecutor reiterated that as the alleged victim, K.B. had rights as well. The court responded that the victim's rights must be balanced with the constitutional considerations of the defendant.

K.B.'s testimony resumed, with an officer present. The next day, when K.B.'s testimony finished, Adams noted on the record that "after [K.B.] finished testifying yesterday, the police officer that had been stationed in the courtroom with [K.B.], left." Adams later noted that the court had offered a mitigating instruction, which Adams declined, explaining,

> The defense feels hamstrung in that if Defense argues an instruction or seeks an instruction, she will call more attention to it, versus not seeking an instruction appearing to waive an opportunity. Defense maintains the objection and strategically seeks not to offer an instruction so as to seek mitigation or amelioration in that regard.

The jury subsequently convicted Adams as charged. The court sentenced him to a low-end standard range sentence of 13 months on assault in the second degree, with the other sentences to run concurrently. Adams timely appeals.

## DISCUSSION

Adams contends that the presence of uniformed police officers solely during K.B.'s testimony created inherent prejudice, "othered" him as a Native American, and indicated he was dangerous. He argues the culmination of these circumstances undermined his right to a fair trial. Alternatively, he argues even if not inherently prejudicial, allowing K.B.'s police escort to be present absent a showing of necessity was an abuse of discretion. We agree with the State that

7

the court did not abuse its discretion by permitting an officer to sit in the back of the courtroom during K.B.'s testimony.

"The trial court has broad discretion to make trial management decisions, including 'provisions for the order and security of the courtroom.' " State v. Gorman-Lykken, 9 Wn. App. 2d 687, 691, 446 P.3d 694 (2019) (quoting State v. Dye, 178 Wn.2d 541, 547-48, 309 P.3d 1192 (2013)). Therefore, we review a trial court's decisions regarding security measures for an abuse of discretion. Id. This standard applies even if the challenged procedure is allegedly prejudicial. Id.

"A defendant has the fundamental right to a fair trial." State v. Butler, 198 Wn. App. 484, 493, 394 P.3d 424; U.S. CONST. amends. VI and XIV; WASH. CONST. art. I, § 22. Although not articulated in the Constitution, the presumption of innocence is a " 'basic component' " of this right. State v. Finch, 137 Wn.2d 792, 844, 975 P.2d 967 (1999) (quoting Estelle v. Williams, 425 U.S. 501, 503, 96 S. Ct. 1691, 48 L. Ed. 2d 126 (1976)).

"[T]o preserve a defendant's presumption of innocence before a jury, the defendant is 'entitled to the physical indicia of innocence which includes the right of the defendant to be brought before the court with the appearance, dignity, and self-respect of a free and innocent [person].' " State v. Jaime, 168 Wn.2d 857, 861-62, 233 P.3d 554 (2010) (quoting Finch, 137 Wn.2d at 844). "Measures which single out a defendant as a particularly dangerous or guilty person threaten his or her constitutional right to a fair trial." Id. at 862 (quoting Finch, 137 Wn.2d at 845). "Such measures threaten a defendant's right to a fair trial because they erode [the] presumption of innocence; these types of courtroom

8

practices are inherently prejudicial." Id. at 862. For example, courts have recognized courtroom security measures such as shackling, handcuffing, gagging, or holding a trial in jail are inherently prejudicial. See Gorman-Lykken, 9 Wn. App. 2d at 692 (citing Finch, 137 Wn.2d at 844 (shackling, handcuffing, or other physical restraints; gagging the defendant) and Jaime, 168 Wn.2d at 864 (holding a trial in a jail)).

Because of these concerns, courts must closely scrutinize such practices to ensure they further essential state interests. Jaime, 168 Wn.2d at 865. "When courtroom arrangements inherently prejudice the fact-finding process, it violates due process unless the arrangements are required by an essential state interest." Butler, 198 Wn. App. at 493 (citing Holbrook v. Flynn, 475 U.S. 560, 568-72, 106 S. Ct. 1340, 89 L. Ed. 2d 525 (1986)).

The U.S. Supreme Court has held that "conspicuous, or at least noticeable, deployment of security personnel in a courtroom during trial" is not inherently prejudicial. Holbrook, 475 U.S. at 562, 568; see also Gorman-Lykken, 9 Wn. App. 2d at 693 ("The routine use of security personnel in a courtroom during trial [] is not an inherently prejudicial practice."). In Holbrook, the Supreme Court considered whether the presence of four uniformed security officers seated behind the defendants in the front row of the spectators' section throughout trial was inherently prejudicial. 475 U.S. at 562. In determining it was not inherently prejudicial, the Court reasoned,

> The chief feature that distinguishes the use of identifiable security
> officers from courtroom practices we might find inherently
> prejudicial is the wider range of inferences that a juror might
> reasonably draw from the officers' presence. While shackling and

9

prison clothes are unmistakable indications of the need to separate a defendant from the community at large, the presence of guards at a defendant's trial need not be interpreted as a sign that he is particularly dangerous or culpable. Jurors may just as easily believe that the officers are there to guard against disruptions emanating from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into violence. Indeed, it is entirely possible that jurors will not infer anything at all from the presence of the guards. If they are placed at some distance from the accused, security officers may well be perceived more as elements of an impressive drama than as reminders of the defendant's special status. Our society has become inured to the presence of armed guards in most public places; they are doubtless taken for granted so long as their numbers or weaponry do not suggest particular official concern or alarm.

Id. at 569.

However, the Court also recognized there could be a possible set of facts in which a security force within the courtroom might " 'create the impression in the minds of the jury that the defendant is dangerous or untrustworthy.' " Id. (quoting Kennedy v. Cardwell, 487 F.2d 101, 108 (6th Cir. 1973), cert. denied, 416 U.S. 959, 94 S. Ct. 1976, 40 L. Ed. 2d 310 (1974)). Thus, the Court acknowledged that " 'reason, principle, and common human experience' counsel against a presumption that any use of identifiable security guards in the courtroom is inherently prejudicial" and "a case-by-case approach is more appropriate." Holbrook, 475 U.S. at 569 (citation omitted) (quoting Estelle, 425 U.S. at 504).

A. Inherent Prejudice

Adams argues that it is inherently prejudicial for an officer to be present solely during a complainant's (alleged victim's) testimony. When a courtroom arrangement is challenged as inherently prejudicial, the question does not

revolve around "whether jurors actually articulated a consciousness of some prejudicial effect, but rather whether 'an unacceptable risk is presented of impermissible factors coming into play.' " Holbrook, 475 U.S. at 570 (quoting Estelle, 425 U.S. at 505). Courts "evaluate the likely effects of a particular procedure based on 'reason, principle, and common human experience.' " Butler, 198 Wn. App. at 493 (quoting Estelle, 425 U.S. at 504).

Washington courts have followed Holbrook and declined to hold that the routine presence of security officers is inherently prejudicial. For example, in Butler, a jail officer was present because the defendant was in custody, and an additional jail officer was present for a portion of the victim's testimony. 198 Wn. App. at 489. This court concluded the second officer's presence was not inherently prejudicial, as "[t]he second officer was not conspicuously close to Butler, did not obstruct [his] view of the witness, did not attract attention, and was not present for the remainder of the victim's testimony." Id. at 486. Further, the court "remedied any potential juror confusion or concern" by providing a limiting instruction conveying that security had not been deliberately heightened at any time during the trial, but additional security "may have appeared because of a routine change in personnel," and the jury should not draw any conclusions based on the presence of security staff. Id. at 489-90, 494.

Similarly, in Gorman-Lykken, the court held there was no inherent prejudice when a corrections officer was stationed next to the witness stand during the defendant's testimony. 9 Wn. App. 2d at 695. The court noted that the officer had been present throughout trial, there was only one officer, she did not

draw attention to herself, and the defendant and the officer moved to and from the witness box outside the jury's presence. Id.

Here, though the officers rotated, only a single officer was present at any time and only during K.B.'s testimony rather than throughout the trial, so unlike in the cases discussed above, there was not a continual security presence. Adams argues that "[t]he officers' presence sent a message to the jury that additional security was needed to protect [K.B.] from Adams," and that this implicit bias othered him, citing State v. Bagby, 200 Wn.2d 777, 794-95, 522 P.3d 982 (2023) ("Studies have shown that even the simplest racial cues can trigger implicit biases and affect the way jurors evaluate evidence and 'subtle manipulations' of a defendant's background—such cues can affect juror decision-making more so than even explicit references to race.") (quoting Praatika Prasad, Notes, Implicit Racial Biases in Prosecutorial Summations: Proposing an Integrated Response, 86 FORDHAM L. REV 3091, 3101 (2018)). But like the officers in Holbrook and Butler, the officers present during K.B.'s testimony were inconspicuously positioned in the back of the courtroom, in the row the furthest away from Adams, and did not attract attention. As in Gorman-Lykken, the jury was not present when the officer moved with K.B. to and from the witness stand, except for the first instance.

Like the courts in Holbrook, Butler, and Gorman-Lykken, we decline to apply "a presumption that any use of identifiable security guards in the courtroom is inherently prejudicial." Holbrook, 475 U.S. at 569. As the Holbrook Court noted, our society is "inured to the presence of armed guards in most public places," id.,

12

and the presence of a single officer for portions of the trial did not convey that Adams was particularly dangerous or culpable or that K.B. was in need of protection, but could just as easily be interpreted as a means to ensure order in the courtroom and protection from outside disruptions. Moreover, as to Adams's suggestion that he was "othered" as a Native American,[2] while implicit race bias may well be present, under these facts, the presence of an officer only during K.B.'s testimony did not create inherent prejudice based on Adams's racial or ethnic status. We conclude that the presence of a single officer solely during K.B.'s testimony was not inherently prejudicial and that a case-specific analysis is more appropriate.

B. Exercise of Discretion

Adams argues in the alternative that if the security officer's presence during K.B.'s testimony was not inherently prejudicial, then the trial court abused its discretion when it did not make case-specific findings related to the security measure. Again, we disagree.

"[T]he trial court must actually exercise discretion based on the facts of the case in considering whether to allow a courtroom security measure." Gorman-Lykken, 9 Wn. App. 2d at 696. However, "[f]or routine security measures such as the presence of officers in the courtroom, no specific inquiry on the record is required for the trial court's exercise of discretion." Id. "[J]urors may not infer anything negative about the presence of security officers '[i]f they are placed at some distance from the accused.' " Id. (quoting Holbrook, 475 U.S. at 569).

---

[2] We note that K.B. also is Native American.

13

Here, in all but one instance, the jury never saw an officer accompany K.B. to the witness stand, and the single officer who was present was seated "at some distance"—indeed, the furthest row possible—away from Adams. This case is factually distinguishable from Gorman-Lykken, in which the court "recognize[d] that the potential for prejudice is greater when a security officer is stationed next to a testifying defendant than when an officer or officers merely are present elsewhere in the courtroom." 9 Wn. App. 2d at 696. In this case, there was no officer stationed near the witness stand at any time. Thus, there was no need for the trial court to state case-specific reasons for the need for the security measure or to determine that the need for the security measure outweighs the potential prejudice to the testifying defendant, unlike in Gorman-Lykken. See 9 Wn. App. 2d at 697-98.[3]

The court must still exercise its discretion based on the facts of the case. Gorman-Lykken, 9 Wn. App. 2d at 695-96. The record is replete with evidence that the court did so here. As discussed above, the trial court heard robust argument from both parties before concluding that one officer sitting in the back would not be unduly prejudicial, especially when, as the court noted, it was common to have up to three officers sitting quietly in a courtroom. See Dye, 178 Wn.2d at 553 ("the trial court is in the best position to analyze the actual necessity of a special dispensation"). Moreover, the court considered and

---

[3] Adams relies on State v. Kennon, in which the security measure at issue was allowing additional officers to be generally present in the courtroom while the victim was testifying. No. 80813-3-I, slip op. at 5 (Wash. Ct. App. Aug. 16, 2021), https://www.courts.wa.gov/opinions/pdf/808133.pdf. The court concluded that "whatever the security measure, a court must provide a reason for its determination." Id. at 13 n.2. As Kennon is an unpublished decision, it has no precedential value and is not binding on any court. GR 14.1(c).

adopted steps to minimize any prejudice: It required the officer and K.B. to enter and exit outside the presence of the jury; it required the officer to sit in the back of the courtroom; and, rather than allowing multiple officers in the courtroom, it required officers to communicate with each other via text.

The trial court properly exercised its discretion by permitting a single officer to remain in the back of the courtroom while K.B. testified. Accordingly, we affirm Adams's convictions.

_Chung, J._

WE CONCUR:

_B#k, J._          _Dwyer, J._