

FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2014 JUN 16 AM 9: 11

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | DIVISION ONE |
| | ) | |
| Respondent, | ) | No. 71644-1-I |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| CHARLES LONGSHORE, | ) | |
| | ) | |
| Appellant. | ) | FILED: June 16, 2014 |
| | ) | |

DWYER, J. — Charles Longshore led police on a high speed chase after he threatened to kill a man who had temporarily prevented Longshore from leaving a housing complex in Shelton, Washington. Once Longshore was apprehended, a search of the vehicle he was driving revealed a pipe containing methamphetamine residue. Subsequently, he was charged with felony harassment, attempting to elude a pursuing police vehicle, and unlawful possession of a controlled substance. At trial, the court determined that, if Longshore chose to testify, a security officer would be stationed at an exit near the witness stand during Longshore's testimony. Longshore did not testify and he was convicted on all counts.

On appeal, he raises a number of challenges to the trial court proceedings. He argues that his right to testify was violated, that no valid waiver of his right was secured, and that his counsel prevented him from testifying.

Additionally, he claims that his counsel was ineffective, and that the State failed to present sufficient evidence to convict him as to the harassment and the unlawful possession charges. None of his arguments persuade us that he is entitled to appellate relief. Accordingly, we affirm his convictions.

I

On March 25, 2012, Longshore arrived at the Firwood Gardens complex in Shelton, Washington. Longshore was driving a "goldish-beige" Dodge Intrepid, which had tinted windows and a small sticker with feathers on it. Although the vehicle was registered in someone else's name, Longshore had been seen driving the Intrepid into Firwood Gardens on more than one occasion.

Charles Aldridge, a resident of Firwood Gardens, had previously told Longshore not to return to the property, and Justin Elston, also a resident, indicated that Longshore had stolen property from Firwood Gardens residents. On this particular day, after Longshore again entered Firwood Gardens, Elston positioned his own vehicle in such a way so as to prevent Longshore from driving away. Elston did this in an effort to detain Longshore. The police were then called. In response to being blocked in, Longshore threatened Elston and other neighbors nearby, claiming that he had a gun and that he would kill every one of them and their families. He also made threatening gestures, including reaching into his pocket and into his vehicle. Fearing that Longshore would carry out his threats, Elston moved his own vehicle and allowed Longshore to drive away. At least one female passenger was in the Intrepid with Longshore when he left.

Officer Daniel Patton of the Shelton Police Department received a

dispatch regarding the Firwood Gardens incident. Shortly thereafter, Patton learned that a fellow officer had contacted or attempted to contact the Intrepid. Rather than stop, the Intrepid had eluded the officer and the officer was in pursuit. After listening to the radio traffic, Patton determined that the fleeing Intrepid could be headed for an intersection with which he was familiar. Patton drove to the intersection and placed spike strips on the street. However, after one of the pursuing officers mistakenly said that the Intrepid was traveling in the opposite direction, Patton removed the spike strips and placed them in his trunk. As soon as Patton had closed his trunk, the fleeing Intrepid drove by him with police cars in pursuit. However, as the Intrepid slowed to make a turn, Patton was able to recognize Longshore as the driver of the vehicle. Patton testified that he had "dealt with" Longshore in the past, involving "numerous contacts" with him.

Deputy Trevor Clark of the Mason County Sherriff's Office also identified Longshore during the pursuit. Clark was directly behind Longshore and was able to see Longshore's face in the rearview mirror of the Intrepid when Longshore slowed to make a turn.

Patton temporarily lost sight of the Intrepid during the pursuit, but again observed the vehicle and its driver some time later. This time, however, his observations "were not as good 'cause I'm physically in my vehicle, the vehicle's coming at me. And it was—it was rather quick, I just wasn't as close." Patton observed that the driver was now wearing some kind of dark hooded sweater or jacket. Patton's vehicle then became the lead police car in pursuit of the Intrepid.

- 3 -

However, as the pursuit entered a residential neighborhood where children were present, Patton slowed his patrol car to 30 miles per hour and turned off his lights and siren. Although the Intrepid did not slow down, Patton could see the direction in which it was headed.

A short time later, the police discovered the Intrepid at the end of a rural road. Longshore and two women were found near the car—hiding behind a shed—and were taken into custody.

A search of the Intrepid revealed a pipe containing unburned methamphetamine, which was found in a sock stuck between the driver's door and the driver's seat.

Patricia Peña, a passenger in the Intrepid, provided a different version of the events. She testified that after Longshore drove away from Firwood Gardens, they stopped at a store called Tozier's. She testified that they picked up Ty Cuzick—her ex-boyfriend at the time that she testified—in the Tozier's parking lot and that Cuzick climbed into the driver's seat, while Longshore moved to the front passenger seat. Peña claimed that Cuzick was driving the Intrepid during the period of time when it was being pursued by the police.

Glenn Probst, who lived near the area where the Intrepid stopped and where Longshore was apprehended, testified that he observed, from some distance away, the driver of the Intrepid—who was wearing a brown jacket—exit the vehicle and flee the scene. Probst further testified that a man in a white T-shirt exited the right front passenger-side door, along with two females who exited from the rear doors, and then all three were detained by the police. Probst

did not see the driver of the vehicle again.

Longshore was charged with felony harassment, attempting to elude a pursuing police vehicle, and unlawful possession of a controlled substance. During Longshore's jury trial, Officer Newell of the Mason County jail expressed a security concern that could arise in the event that Longshore decided to testify. In the particular courtroom in which the trial was taking place, there was an exit door behind the witness box and the witness box was only 4 or 5 feet away from the jury box. Based on the layout of the courtroom, Officer Newell wanted to place a security officer at the exit door. Longshore's attorney objected to this proposed arrangement, arguing that having a security officer posted "essentially next to" Longshore would be prejudicial. The prosecutor did not present any argument, instead deferring to the court. The court then stated the following on the record:

> The issue before the Court is what type of restraints—security should be on a defendant in a jury trial. This is a case that is an eluding, a harassment and a possession of a controlled substance. However Mr. Longshore is also held on another set of charges, which are aggravated murder.
>
> Currently, in this trial Mr. Longshore has been unrestrained at the table, but there has been the presence of three officers from the jail. . . .
>
> There has been a request made that if Mr. Longshore testifies that the officer then be placed behind him when Mr. Longshore is in the [witness] box. . . . When he's in the witness box, to put an officer behind him that is between him and the jury box.
>
> A court has to weigh the issue of whether or not the appearance of having an officer there would be prejudicial to the defense in that it makes it more apparent to the jury that Mr. Longshore is quote, in custody, for the purposes of how that would

affect them in rendering—in deliberating on their verdict versus the need for security with an individual who, although this particular case involves an eluding, which is less serious, an eluding does mean a flight risk, because that's essentially what eluding is; you're eluding a police officer. So the Court has originally found probable cause to believe there's a reason Mr. Longshore would flee, that's what this charge is. In addition, there would also—there's also the other charges Mr. Longshore is being held on.

Longshore's counsel subsequently informed the trial court that Longshore would not testify: "Mr. Longshore and I have discussed his right to testify. He indicates that he . . . would prefer to testify, but on my advice will not testify." His counsel then invited the court to engage in a colloquy with Longshore on the record, but the court refused to do so. His counsel then stated, "I have made it clear to him that it is his right, and nobody—the Court, myself—nobody can take away that right. But on my advice, he will choose not to testify."

Following a jury trial, Longshore was convicted on all counts. He appeals.

II

Longshore first contends that his right to testify was violated. This violation occurred, he avers, when the trial court ruled that it would post a courtroom security officer at a door near the witness stand if Longshore testified. Longshore argues on appeal that this measure would have been inherently prejudicial. We disagree.

"[T]rial management decisions" are reviewed "for abuse of discretion." State v. Jaime, 168 Wn.2d 857, 865, 233 P.3d 554 (2010). "'A trial judge must exercise discretion in determining the extent to which courtroom security measures are necessary to maintain order and prevent injury.'" Jaime, 168

Wn.2d at 865 (quoting State v. Hartzog, 96 Wn.2d 383, 400, 635 P.2d 694 (1981)).

"'When a courtroom arrangement is challenged as inherently prejudicial, the question to be answered is whether an unacceptable risk is presented of impermissible factors coming into play.'" Jaime, 168 Wn.2d at 862 (quoting In re Pers. Restraint of Woods, 154 Wn.2d 400, 417, 114 P.3d 607 (2005)). "A courtroom practice might present an unacceptable risk of impermissible factors coming into play because of 'the wider range of inferences that a juror might reasonably draw' from the practice." Jaime, 168 Wn.2d at 862 (quoting Holbrook v. Flynn, 475 U.S. 560, 569, 106 S. Ct. 1340, 89 L. Ed. 2d 525 (1986)).

> In Holbrook, the Court considered whether the presence of security guards in the courtroom was inherently prejudicial. Id. at 568-69. Preliminarily, the Court did not focus its inquiry on the particular arrangement of the guards at Holbrook's trial. Id. Instead, it considered whether the presence of security guards in *general* was inherently prejudicial. Id. In concluding it was not, the Court found it significant that "[o]ur society has become inured to the presence of armed guards in most public places; they are doubtless taken for granted so long as their numbers or weaponry do not suggest particular official concern or alarm." Id. at 569.

Jaime, 168 Wn.2d at 863. However, the Holbrook Court did not foreclose the possibility that, under certain circumstances, deployment of security guards could violate a defendant's constitutional right to receive a fair trial: "In view of the variety of ways in which such guards can be deployed, we believe that a case-by-case approach is more appropriate." 475 U.S. at 569.

In Holbrook, the respondent claimed that he was prejudiced by the placement of four uniformed state troopers in the first row of the courtroom's

spectator section at his trial. 475 U.S. at 570-71. The United States Supreme Court disagreed, concluding that, "we simply cannot find an unacceptable risk of prejudice in the spectacle of four such officers quietly sitting in the first row of a courtroom's spectator section" and that "[f]our troopers are unlikely to have been taken as a sign of anything other than a normal official concern for the safety and order of the proceedings." Holbrook, 475 U.S. at 571.

Contrary to Longshore's contention, the guard's presence at the nearby door would not have been inherently prejudicial had Longshore testified. One security guard posted by a door would be unlikely to have been taken as a sign of anything other than a normal official concerned for the safety and order of the proceedings. This is particularly evident when, as in this case, three officers had already been present in the courtroom throughout the trial. Although Longshore expresses concern for the guard's placement between the witness stand and the jury box, the guard would have been set back at least several feet behind the witness stand and away from the jury box and, by all appearances, would have quite clearly been guarding the door. Inherent prejudice does not follow from such an arrangement.

Nevertheless, Longshore contends that the trial court was required to make a record of a compelling individualized threat posed by Longshore, meaning that there had to be "evidence which indicates that the defendant poses an imminent risk of escape, that the defendant intends to injure someone in the courtroom, or that the defendant cannot behave in an orderly manner while in the courtroom." State v. Finch, 137 Wn.2d 792, 850, 975 P.2d 967 (1999).

Longshore's reliance on Finch is misplaced. The defendant in that case was shackled during the trial and sentencing, and such physical restraint during trial is inherently prejudicial. See, e.g., Jaime, 168 Wn.2d at 862 n.3. Where, as here, security measures are not inherently prejudicial, it is not incumbent upon the trial court to make a record of a compelling individualized threat. Given that Longshore was charged with eluding a police officer—as well as the murder charges in a different case—which tended to show that Longshore was a flight risk and that he was not a person who obeys court orders,[1] the trial court exercised its discretion judiciously.[2]

III

Longshore next contends that the trial court failed to complete its basic responsibility to determine that Longshore validly waived his right to testify. This failure occurred, Longshore avers, when the trial court refused to engage in a colloquy with Longshore to determine whether he had voluntarily waived his right to testify. We disagree.

Our Supreme Court has held that the United States Constitution imposes no obligation on trial judges to inform defendants of the right to testify. State v.

---

[1] The court order being that he not engage in any criminal behavior while on release awaiting trial.

[2] Longshore's contention that the court should have considered viable alternatives is unavailing. As an initial matter, the trial court exercised its discretion, meaning that regardless of whether viable alternatives existed, we will not question its selection of one of those alternatives. Moreover, the alternatives suggested by Longshore, which included hidden restraints, electrical belt devices, or locking the exit door near the witness stand, must only be considered before ordering physical restraints. State v. Thompson, 169 Wn. App. 436, 470, 290 P.3d 996 (2012), review denied, 176 Wn.2d 1023 (2013). The thrust of this requirement is, again, tethered to the notion that inherently prejudicial security measures must be imposed only after adhering to a well-delineated procedure. There was no inherent prejudice from the security measure imposed here. Thus, the trial court did not need to adhere to the procedure outlined in cases such as Jaime and Finch.

Thomas, 128 Wn.2d 553, 558-59, 910 P.2d 475 (1996). Furthermore, although "the waiver of the right to testify must be knowing," it does not follow "that the trial court must obtain an on-the-record waiver of the right." Thomas, 128 Wn.2d at 559. "[A] defendant is not deprived of his constitutional right to testify merely because the trial court does not inform him of the existence of that right—it is the responsibility of defense counsel to inform the defendant of the right to testify." State v. O'Cain, 169 Wn. App. 228, 244, 279 P.3d 926 (2012). Moreover, "there is no requirement of a colloquy on the record to protect the state constitutional right to testify in one's behalf." State v. Russ, 93 Wn. App. 241, 243, 969 P.2d 106 (1998).

In essence, Longshore argues that his counsel's invitation to the trial court to engage in a colloquy with Longshore precluded it from presuming that Longshore had voluntarily waived his right. However, Longshore's counsel explicitly represented to the trial court that it was made clear to Longshore that only he could waive his right to testify and that Longshore—on the advice of his counsel—had, in fact, waived that right.

> Mr. Longshore and I have discussed his right to testify. He indicates that . . . he would prefer to testify, but on my advice will not testify. And if the Court wishes to engage in a colloquy with him to ensure that it's knowingly, voluntarily and intentionally—decision was made under those circumstances, I would invite that to complete the record. . . .
>
> And I have made it clear to him that it is his right, and nobody—the Court, myself—nobody can take away that right. But on my advice, he will choose not to testify.

Defense counsel's invitation to engage in a colloquy with Longshore does

not cast doubt upon the voluntariness of Longshore's waiver. The requirement of voluntariness is meant to thwart coercion, not to enshrine the initial preferences of criminal defendants. Although Longshore's preference may have been to testify on his own behalf, after conferring with his counsel, he voluntarily waived that right. Thomas requires no further inquiry. Indeed, Thomas cautions against engaging in a colloquy with the defendant, explaining that it "might have the undesirable effect of influencing the defendant's decision not to testify." 128 Wn.2d at 560. "As a result, courts rely upon defense counsel to inform the defendant of his constitutional right to testify." Thomas, 128 Wn.2d at 560. Here, defense counsel quite clearly did inform Longshore of his right to testify. Hence, the trial court acted prudently by refusing to engage in a colloquy with Longshore.

## IV

Longshore next contends that his counsel prevented him from testifying and asks either that a reference hearing be held or a new trial be ordered. However, he fails to present substantial factual evidence to support his claim and, thus, his contention is unavailing.

> After trial, a silent defendant may assert a claim that his attorney prevented him from testifying. See [In re Pers. Restraint of] Lord, 123 Wn.2d [296,] 317 [868 P.2d 835 (1994)]; accord Underwood v. Clark, 939 F.2d 473, 476 (7th Cir. 1991); contra United States v. McMeans, 927 F.2d 162, 163 (4th Cir. 1991) (holding that the defendant "can not now approach the court and complain of the result of his decision"). The defendant must, however, produce more than a bare assertion that the right was violated; the defendant must present substantial, factual evidence in order to merit an evidentiary hearing or other action. Accord Underwood, 939 F.2d at 476 (rejecting a claim in which a defendant failed to produce more than "a bare, unsubstantiated, thoroughly self-serving, and none too plausible statement that his lawyer (in

violation of professional standards) forbade him to take the stand").
Thomas, 128 Wn.2d at 561.

In Thomas, our Supreme Court concluded that when the defendant was present during the court's questioning of defense counsel and where his counsel claimed that he had discussed the choice with the defendant and had informed him that it was the defendant's decision, the defendant's failure to provide any factual evidence that his counsel had prevented him from testifying precluded him from obtaining relief. 128 Wn.2d at 561. As in Thomas, Longshore was present when his counsel told the court that counsel had discussed the choice with Longshore and had informed him that it was his decision. As in Thomas, there is no indication from the record that Longshore disagreed with his counsel or that he attempted to assert his right to testify. Moreover, Longshore's averment on appeal that he was prevented from testifying is unsubstantiated. He argues that his trial counsel's declaration in support of the motion for a new trial substantiates his claim; however, that declaration merely states that Longshore chose not to testify. It does not corroborate Longshore's version of events. Longshore is not entitled to a reference hearing or to a new trial.

IV

Longshore next contends that his trial counsel rendered ineffective assistance. This occurred, he asserts, when his counsel refused the trial court's offer of an "unwitting possession" jury instruction. We disagree.

"In order to prevail on a claim of ineffective assistance of counsel," Longshore "must demonstrate (1) deficient performance, that his attorney's

representation fell below the standard of reasonableness, and (2) resulting prejudice that, but for the deficient performance, the result would have been different." State v. Hassan, 151 Wn. App. 209, 216-17, 211 P.3d 441 (2009) (citing Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). "In evaluating an ineffective assistance of counsel claim, this court "must begin with 'a strong presumption counsel's representation was effective' and must base its determination on the record below." In re Pers. Restraint of Hutchinson, 147 Wn.2d 197, 206, 53 P.3d 17 (2002) (quoting State v. McFarland, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995)). "The defendant alleging ineffective assistance of counsel 'must show in the record the absence of legitimate strategic or tactical reasons supporting the challenged conduct by counsel.'" Hutchinson, 147 Wn.2d at 206 (quoting McFarland, 127 Wn.2d at 336). "[D]eliberate tactical choices may constitute ineffective assistance of counsel if they fall outside the wide range of professionally competent assistance." In re Pers. Restraint of Davis, 152 Wn.2d 647, 714, 101 P.3d 1 (2004).

"The State has the burden of proving the elements of unlawful possession of a controlled substance as defined in the statute—the nature of the substance and the fact of possession." State v. Bradshaw, 152 Wn.2d 528, 538, 98 P.3d 1190 (2004). "Defendants then can prove the affirmative defense of unwitting possession." Bradshaw, 152 Wn.2d at 538. Defendants have the burden to prove by a preponderance of the evidence that the controlled substance was possessed unwittingly. State v. Riker, 123 Wn.2d 351, 368, 869 P.2d 43 (1994).

A review of the record indicates that defense counsel's decision not to accept an unwitting possession instruction was a legitimate trial tactic. Longshore's theory at trial was that he was not the owner or the driver of the Intrepid. Had his counsel elected to include an unwitting possession instruction, the affirmative defense would have been incongruous with his other theory— unwitting possession concedes the concept of dominion and control, which is what Longshore argued he did not exercise over the Intrepid. By pursuing a theory based on unwitting possession, Longshore would have unnecessarily risked confusing the jury with distinct burdens of proof and would have caused him to assume a burden of proof, rather than forcing the State to meet its burden. Longshore's defense counsel's tactical decision to put the State to its burden of proving possession was reasonable and his performance, therefore, was not deficient.[3]

V

Longshore next contends that the State failed to present sufficient evidence to support his conviction of felony harassment. This is so, he avers, because the State failed to prove beyond a reasonable doubt that he threatened

---

[3] In a statement of additional grounds (SAG), Longshore argues that his defense counsel rendered ineffective assistance. This is so, he asserts, because counsel failed to assert self-defense to the charge of felony harassment but went on to argue the lawful authority of that threat. Longshore's assertion is unavailing. A review of the record reveals that his counsel did not argue that the threat was lawfully made. Instead, counsel argued that the State had failed to prove beyond a reasonable doubt that a credible threat had been made. We do not question defense counsel's tactical decision to pursue this theory, particularly given that the State was required to prove beyond a reasonable doubt that Longshore acted without lawful authority.

- 14 -

Justin Elston[4] without lawful authority.[5] We disagree.

"'It is a fundamental precept of criminal law that the prosecution must prove every element of the crime charged beyond a reasonable doubt.'" State v. Williams, 136 Wn. App. 486, 492-93, 150 P.3d 111 (2007) (quoting State v. Brown, 147 Wn.2d 330, 339, 58 P.3d 889 (2002)). "If a statute indicates an intent to include absence of a defense as an element of the offense, or the defense negates one or more elements of the offense, the State has a constitutional burden to prove the absence of the defense beyond a reasonable doubt." State v. Lively, 130 Wn.2d 1, 11, 921 P.2d 1035 (1996); see also State v. Hickman, 135 Wn.2d 97, 102, 954 P.2d 900 (1998) ("[T]he State assumes the burden of proving otherwise unnecessary elements of the offense when such added elements are included without objection in the 'to convict' instruction.").

"A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). "In determining the sufficiency of the evidence, circumstantial evidence is not to be considered any less reliable than direct evidence." State v. Delmarter, 94 Wn.2d 634, 638, 618 P.2d 99 (1980).

---

[4] Longshore also claims that insufficient evidence was presented that he threatened "Aldridge," presumably referring to Charles and Judith Aldridge. However, the State did not charge Longshore with harassment toward the Aldridges and the jury instructions made no mention of them.

[5] Longshore asserts that the trial court's definition of "without lawful authority" contained within the jury instructions failed to give the jury any guidance as to how the State could prove that element. This error, he claims, denied him due process of law. However, because this claim of error was not presented to the trial court and because any possible error would not be of constitutional magnitude, we do not consider it on appeal. "As long as the instructions properly inform the jury of the elements of the charged crime, any error in further defining terms used in the elements is not of constitutional magnitude." State v. Stearns, 119 Wn.2d 247, 250, 830 P.2d 355 (1992); see also RAP 2.5(a).

"Deference must be given to the trier of fact who resolves conflicting testimony and evaluates the credibility of witnesses and persuasiveness of material evidence." State v. Carver, 113 Wn.2d 591, 604, 781 P.2d 1308, 789 P.2d 306 (1989).

The State charged Longshore with one count of felony harassment, alleging that Longshore

> knowingly and without lawful authority, did threaten to kill another immediately or in the future, to wit: Justin Elston, and by words or conduct placed the person threatened in reasonable fear that the threat would be carried out; contrary to RCW 9A.46.020(1)(a)(i) and (2)(b) and against the peace and dignity of the State of Washington.

With respect to the harassment charge, the jury was instructed as follows:

> A person commits the crime of harassment when he or she, without lawful authority, knowingly threatens to cause bodily injury immediately or in the future to another person, and when he or she, by words or conduct, places the person threatened in reasonable fear that the threat will be carried out and the threat to cause bodily harm consists of a threat to kill the threatened person or another person.

Jury Instruction 11. The jury was further instructed that "[a] person acts without lawful authority when that person's acts are not authorized by law." Jury Instruction 14.

Longshore avers that the State's evidence was insufficient to establish that he acted without lawful authority because Elston could have been charged with unlawful imprisonment, and Longshore's use of force was reasonable. Without deciding whether Longshore is correct in his contention that Elston could have been charged with unlawful imprisonment, the record indicates quite clearly

that the degree of force used by Elston to prevent Longshore from driving away was minimal. He made no attempt to physically harm Longshore or any of Longshore's property. Nevertheless, Longshore threatened to kill Elston if he did not move his vehicle.

"[T]he degree of force used in self-defense is limited to what a reasonably prudent person would find necessary under the conditions as they appeared to the defendant." State v. Walden, 131 Wn.2d 469, 474, 932 P.2d 1237 (1997). "Deadly force may be used only in self-defense if the defendant reasonably believes he or she is threatened with death 'or great personal injury.'" Walden, 131 Wn.2d at 474 (quoting 13A ROYCE A. FERGUSON, JR. & SETH AARON FINE, WASHINGTON PRACTICE: CRIMINAL LAW § 2604, at 351 (1990)). "Threats of bodily injury also lawfully may be made when circumstances justify violent action in self-defense." State v. Smith, 111 Wn.2d 1, 9, 759 P.2d 372 (1988).

Longshore's threat was not authorized by law. Elston made no attempt to harm Longshore's person or property and gave no reason for Longshore to react as he did. Longshore's response to Elston's maneuver that blocked his vehicle was disproportionate and unreasonable. It was not a harmless "ruse," as he attempts to characterize it on appeal. The evidence was that Longshore threatened to kill Elston and reached into his car as if he was getting a gun. Sufficient evidence was admitted at trial to establish beyond a reasonable doubt that Longshore acted without lawful authority. Hence, we grant no appellate

relief to Longshore with respect to his felony harassment conviction.[6]

VI

Longshore next contends that the State presented insufficient evidence to support his conviction of unlawful possession of a controlled substance. This is so, he asserts, because insufficient evidence was presented that he exercised dominion and control over the Intrepid in which the controlled substance was discovered. We disagree.

As observed, "[a] claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." Salinas, 119 Wn.2d at 201. "Deference must be given to the trier of fact who resolves conflicting testimony and evaluates the credibility of witnesses and persuasiveness of material evidence." Carver, 113 Wn.2d at 604.

"Possession . . . may be either actual or constructive." State v. Callahan, 77 Wn.2d 27, 29, 459 P.2d 400 (1969). Constructive possession of drugs requires that a person exercise dominion and control over the drugs or the premises where the drugs are found. Callahan, 77 Wn.2d at 29-30; see also State v. George, 146 Wn. App. 906, 920, 193 P.3d 693 (2008) ("An automobile

---

[6] In a SAG, Longshore contends that the State presented insufficient evidence to support his felony harassment conviction. This is so, he avers, because the State did not present evidence that the victim was placed in reasonable fear that Longshore's threat would actually be carried out.

"In order to convict an individual of felony harassment based upon a threat to kill, RCW 9A.46.020 requires that the State prove that the person threatened was placed in reasonable fear that the threat to kill would be carried out as an element of the offense." State v. C.G., 150 Wn.2d 604, 612, 80 P.3d 594 (2003). The State offered evidence that Longshore threatened Elston and neighbors nearby, claiming that he had a gun and that he would kill every one of them and their families. He also made threatening gestures, including reaching into his pocket and into his vehicle. This evidence was sufficient to establish a reasonable fear that Longshore would carry out his threats. No appellate relief is warranted.

- 18 -

may be considered a 'premises.'"). Proximity alone, without proof of dominion and control, is insufficient to establish possession. State v. Raleigh, 157 Wn. App. 728, 737, 238 P.3d 1211 (2010).

In support of his contention, Longshore argues that he "did not own the vehicle in which the drugs were found" and that "the record indicated that Mr. Cuzick was both the driver and owner of the Dodge." Conflicting evidence was presented on these points during the trial. Given that Longshore challenges the sufficiency of the evidence, our review credits the truth of the State's evidence.

The State offered testimony that Longshore was the driver of the Intrepid during the police pursuit and that Longshore had been seen driving the Intrepid before the pursuit, suggesting that he had been in possession of the vehicle for some time. Furthermore, the State offered testimony that methamphetamine was found between the driver's seat and the driver's door. The evidence offered by the State was sufficient to establish that Longshore exercised dominion and control over the vehicle in which the methamphetamine was found.[7] Longshore's contentions to the contrary go to the weight of the evidence. No appellate relief is warranted.

VII

Longshore makes several contentions that were not made by his attorney on appeal. However, they are unavailing.

Longshore first contends that he was denied due process of law. This is

---

[7] In a SAG, Longshore also argues that the State presented insufficient evidence that he exercised dominion and control. We reject his duplicative argument.

so, he contends, because a probable cause determination as to the count of felony eluding was not made within 48 hours after arrest or at any point before trial. Review of the transcript reveals that the trial court did find probable cause as to the count of eluding prior to Longshore's trial, and that probable cause was found as to the felony harassment count within 48 hours of Longshore's arrest, thus authorizing his continued detention, subject to conditions of release. See CrR 3.2. Longshore's contention does not provide a basis for appellate relief.

Longshore next contends that prosecutorial misconduct occurred during closing statements. This occurred, he argues, when the prosecutor improperly commented on the defense's failure to question Patricia Peña regarding the felony harassment charge, thereby shifting the burden of proof. Although Longshore does not cite to the record, presumably he is referring to the prosecutor's following statement made during rebuttal: "You'll notice that [defense] counsel skipped over when she was on the stand what happened during the harassment. She was never asked about that, even though she was there." Longshore did not object to this statement.

"In order to prevail on a claim of prosecutorial misconduct, a defendant is required to show that in the context of the record and all of the circumstances of the trial, the prosecutor's conduct was both improper and prejudicial." In re Pers. Restraint of Glasmann, 175 Wn.2d 696, 704, 286 P.3d 673 (2012). If the defendant fails to object at trial, complained of error is waived unless the defendant "establishes that the misconduct was so flagrant and ill intentioned that an instruction would not have cured the prejudice." Glasmann, 175 Wn.2d at

704.

"Shifting the burden of proof to the defendant is improper argument, and ignoring this prohibition amounts to flagrant and ill-intentioned misconduct." Glasmann, 175 Wn.2d at 713. "Misstating the basis on which a jury can acquit insidiously shifts the requirement that the State prove the defendant's guilt beyond a reasonable doubt." Glasmann, 175 Wn.2d at 713.

The prosecutor's comment here was not improper. He observed that defense counsel did not question Peña about the incident upon which the felony harassment charge was based. However, the prosecutor did not improperly argue or imply that this failure to question was a basis for the jury to convict on that count. No prosecutorial misconduct occurred. Even if it had, a timely objection and curative instruction would have cured any prejudice. Glasmann, 175 Wn.2d at 704.

Affirmed.

We concur: